869 So.2d 13 (2004)
STATE of Florida, AGENCY FOR HEALTH CARE ADMINISTRATION, Appellant,
v.
MIED, INC., a Florida corporation and John E. Carter, individually, Appellees.
No. 1D02-4110.
District Court of Appeal of Florida, First District.
February 27, 2004.
Rehearing Denied April 5, 2004.
*15 Charles J. Crist, Jr., Attorney General, and Christopher M. Kise, Solicitor General, and Louis F. Hubener, Deputy Solicitor General, Tallahassee, for Appellant.
James C. Rinaman, Jr., and Sonya H. Hoener of Marks Gray, P.A., Jacksonville, for Appellees.
KAHN, J.
The Florida Agency for Health Care Administration (AHCA) appeals from a $20 million jury award in favor of appellee, MIED, Inc. The jury found that AHCA had breached its Medicaid Provider Agreement with MIED and further found against AHCA on a claim of "equitable estoppel." Because we find that MIED's breach of contract theories fail as a matter of law and that equitable estoppel is not available as a cause of action on the facts here, we reverse.

I. Background
In 1980, John Carter and his business partner, Joe Cowart, constructed what is *16 now the Southlake Nursing and Rehabilitation Center, a nursing home in Jacksonville. Carter and Cowart served on the board of directors of Southlake, Inc. (Southlake), the corporate owner of the nursing home. Between 1980 and 1997, several different firms were employed to manage the nursing home as it transitioned from a for-profit facility to a non-profit facility. Over the years, Southlake accumulated substantial debts resulting from its ownership of the nursing home.
Early in 1998, Carter decided to purchase Southlake's assets through MIED, Inc., a corporation in which Carter was the sole shareholder. Carter felt he was the only person who could realistically afford to purchase Southlake because a large portion of its debts were owed to him. Upon his purchase of Southlake, Carter intended to return the nursing home to a for-profit status thereby obviating the need for outside management as required under tax rules regulating non-profit entities. Carter believed that eliminating the cost of outside management would aid the nursing home in achieving a profit, a goal not previously attained.
Critical to Carter's plan was an anticipated rate step-up in Medicaid reimbursements of $10 per patient, per day. To be eligible for a rate step-up, MIED would have to be deemed an unrelated purchaser by AHCA, the Florida agency responsible for Medicaid administration. In late January 1998, after consulting with his attorney, Carter spoke with Frank Hughes, an AHCA administrator, about the possibility of a rate step-up. According to Carter, Hughes said that MIED would be an unrelated party and therefore eligible for a rate step-up if Carter resigned from his position at Southlake as president and board member and exercised no further control of Southlake.
Carter resigned on February 20, 1998, and Cowart took over as Southlake's president. At Cowart's request, Carter, through MIED, continued day-to-day management of the nursing home. In early December 1998, Carter, aided by Clara Corcoran, the nursing home's administrator, and Karen Hoyt, the nursing home's office manager, developed a business plan for MIED which assumed, among other things, a rate step-up. MIED's purchase of Southlake closed on December 21, 1998.
Soon after the sale, in February 1999, several AHCA officials met and concluded that the nursing home should be placed in receivership. Underlying justifications for the decision included: 1) several instances of delinquent debts; 2) a site visit resulting in a substandard grade due to maintenance and repair issues; 3) Southlake's inability to produce financial records for the years 1995 and 1996 in response to a random audit; and 4) an ongoing investigation by the Attorney General's Medicaid Fraud Unit. Moving forward with its plan to institute receivership proceedings, AHCA conducted a site visit at the nursing home and subpoenaed its financial records in March 1999.
In April and May, MIED made several unavailing requests to AHCA for implementation of a rate step-up. At that time, AHCA had yet to make a formal determination of whether MIED and Southlake were related parties. To make matters worse from MIED's perspective, AHCA withheld Medicaid reimbursements of $423,765.57 for the month of April in anticipation of the pending receivership proceeding. AHCA filed its petition for receivership on May 19, 1999. After a two-day hearing, the circuit court entered an order granting the petition on May 26, 1999. The next day, AHCA paid $155,168.23 of the April reimbursements to cover the nursing home's payroll. AHCA *17 paid the remainder of the April reimbursements on June 9, 1999, two days after appointment of a receiver.
On June 11, 1999, MIED filed a Petition for Formal Administrative Hearing seeking a determination that MIED was not a related party purchaser and would therefore qualify for a rate step-up. Over the course of the next several weeks, events began to unfold rapidly. On June 22, MIED's lender, Principal Commercial Acceptance (PCA), declared MIED in default and stated its intent to foreclose on MIED's mortgage. The same day, AHCA issued its final agency action determining that MIED was a related party purchaser and thus not entitled to a rate step-up.
On June 29, MIED filed a motion for an expedited hearing on its petition for administrative hearing regarding the rate step-up. On June 30, AHCA informed Carter that he must either find an unrelated purchaser for the nursing home or begin efforts to relocate the residents within thirty days. On July 8, AHCA issued a thirty-day Medicaid provider termination letter. The following day, residents of the nursing home were informed they had thirty days to relocate to another facility. On July 13, 1999, MIED and AHCA agreed that AHCA would allow the receivership to continue an additional thirty days in order for PCA to conduct a foreclosure sale of the nursing home to an unrelated third party.
On July 30, AHCA approved and joined what appeared to be a global settlement among MIED, PCA, and Carter. The four-way settlement (including AHCA) allowed the receivership to continue during PCA's foreclosure, provided for PCA's payment of $15,000 per month to Carter for twelve months, and excused Carter's personal guarantee of the $9.3 million mortgage. Moreover, in return for AHCA's approval of the settlement, MIED immediately dismissed with prejudice its petition for formal administrative hearing on the rate step-up issue on August 2.
On September 12, 2000, MIED and Carter filed an eight-count complaint against AHCA alleging: 1) unlawful taking without just compensation; 2) unlawful taking without due process of law; 3) inverse condemnation; 4) breach of contract; 5) equitable estoppel; 6) misrepresentation; 7) interference with business relationships; and 8) intentional infliction of emotional distress. On June 18, 2002, MIED and Carter amended the complaint, leaving four counts: 1) inverse condemnation; 2) breach of contract; 3) equitable estoppel; and 4) misrepresentation. The trial court eventually granted AHCA's motion for directed verdict on MIED's inverse condemnation claim and Carter was dropped as a plaintiff. A Jacksonville jury returned a $20 million verdict in favor of MIED finding that AHCA had breached the Medicaid Provider Agreement and had made material misrepresentations upon which MIED reasonably relied to its detriment.
AHCA raises a number of issues on appeal. Dispositive of the case, however, are the issues concerning whether MIED has a claim for breach of contract or has a cause of action based upon "equitable estoppel." Accordingly, we address each of these issues in turn.

II. Claim for Breach of Medicaid Provider Agreement

A. AHCA's Denial of MIED's Request for a Rate Step-up
MIED argued below that AHCA's refusal to grant it a rate step-up constituted a breach of contract. We find that MIED conclusively waived any challenge to denial of a rate step-up by entering into a settlement that has never been set aside. To hold otherwise would deprive AHCA of the benefit of its bargain and would allow *18 MIED and its owner, Carter, to retain the benefits of the settlement and to sue as if no settlement took place. MIED's Notice of Voluntary Dismissal provided:
The Petitioner, MIED, Inc. d/b/a Southlake Nursing and Rehabilitation Center, through its undersigned counsel, hereby voluntarily dismisses, with prejudice, its Petition for Formal Administrative Hearing filed in this matter. For and in consideration of this voluntary dismissal by Petitioner, the Respondent has agreed to (1) Rescind the letter terminating the Petitioner's Medicaid provider number, and (2) Allow for the appointment of a Receiver to operate the facility pending the sale.
(Emphasis added.) By this language AHCA agreed to conditions, beneficial to MIED, allowing the facility to operate until a sale, in exchange for MIED's promise to abandon the rate step-up issue. The trial court should have honored this agreement by granting AHCA's motion for summary judgment on the issue of whether the denial of the rate increase constituted a breach of contract.
AHCA also argues that by voluntarily dismissing its petition with prejudice, MIED abandoned, short of any conclusion, any remaining opportunity for administrative relief. Thus, AHCA urges that the doctrine of exhaustion of administrative remedies bars MIED from seeking relief in the circuit court on the rate step-up issue. We agree.
To avoid the requirement for exhaustion of administrative remedies, a party must satisfy one of the tests established by our case law:
(1) the complaint must demonstrate some compelling reason why the APA (Chapter 120, Florida Statutes) does not avail the complainants in their grievance against the agency; or (2) the complaint must allege a lack of general authority in the agency and, if it is shown, that the APA has no remedy for it; or (3) illegal conduct by the agency must be shown and, if that is the case, that the APA cannot remedy that illegality; or (4) agency ignorance of the law, the facts, or public good must be shown and, if any of that is the case, that the Act provides no remedy; or (5) a claim must be made that the agency ignores or refuses to recognize related or substantial interests and refuses to afford a hearing or otherwise refuses to recognize that the complainants' grievance is cognizable administratively.
Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n, 689 So.2d 1127, 1129 (Fla. 1st DCA 1997)(quoting Communities Fin. Corp. v. Fla. Dep't of Envtl. Regulation, 416 So.2d 813, 816 (Fla. 1st DCA 1982)). MIED has never shown that no remedy would have been available under the APA or that AHCA refused to afford it a hearing on its petition. Nevertheless, MIED argues on appeal that "pursuit by MIED of administrative remedies for the erroneous related-party determination would not have afforded any relief, because MIED would have been out of business due to AHCA's improper withholding of Medicaid payments, the eventual receivership, and the mortgage foreclosure." The force of this argument is diminished by the fact that MIED filed its petition for an administrative hearing in the first place and then used its pending petition as leverage to reach a settlement with AHCA. MIED's unequivocal abandonment of administrative remedies in this case bars its claims. See Communities Fin. Corp., 416 So.2d at 816 (finding that a failure to pursue administrative avenues of relief precluded a conclusion that the remedies of the administrative process were inadequate).
*19 MIED also successfully argued below that a question of fact existed as to whether it was coerced into the settlement. MIED relies on Dantzler Lumber & Export Co. v. Defreitas, 544 So.2d 1135 (Fla. 4th DCA 1989), for support of the proposition that the existence of duress is a jury question. Dantzler Lumber, however, involved questions of conflicting evidence regarding whether an employee's resignation was the product of duress and therefore involuntary. In this case, the duress claimed by MIED resulted from its placement into receivership. AHCA had a statutory right to petition for receivership. Threatening or exercising a legal right does not constitute duress. See City of Miami v. Kory, 394 So.2d 494, 498 (Fla. 3d DCA 1981) (observing that "the act supposedly coerced must be caused by some improper or illegal conduct of the defendant"). Moreover, AHCA prevailed in the receivership matter and MIED did not appeal. For the jury to have found that MIED was under duress required it to conclude that AHCA had no basis for seeking the receivership and that the circuit court erred by granting the petition. That type of determination, however, is the province of an appellate court, not a jury.
The trial court erred by allowing a jury to consider whether AHCA's denial of a rate step-up constituted a breach of contract. MIED's settlement agreement, its failure to pursue administrative remedies, and failure to properly show duress render the claim insufficient as a matter of law.

B. AHCA's Institution of Receivership Proceedings
MIED persuaded the jury that AHCA's actions culminating in the appointment of a receiver violated a provision in the Medicaid Provider Agreement which required AHCA to comply with applicable laws and regulations. Although nothing in the contract specifically prevents AHCA from seeking a receivership, MIED essentially argued that AHCA conspired to create a false basis for the receivership with the solitary intention of driving Carter out of the nursing home business. This conspiracy, MIED argued, was contrary to law and therefore a breach of the provider agreement.
In advancing these themes, MIED ignored that it had appropriate forums for raising such claims in the receivership proceeding or a potential appeal. The federal Medicaid law requires that states have a mechanism in place for appointing a receiver to assure the health and safety of nursing home residents. See 42 U.S.C. § 1396r(h)(2)(A)(iii). Allowing Medicaid providers to challenge the propriety of a receivership in a civil suit before a jury, rather than on direct appeal of the receivership proceeding, would potentially vaporize AHCA's ability to administer receivership proceedings, thereby endangering Florida's ability to comply with federal law.
Beyond these considerations, the breach of contract claim also fails as a matter of law under the doctrine of collateral estoppel. MIED's case focused the impropriety of the receivership. Had it properly considered collateral estoppel, the trial court would never have allowed this. In Mobil Oil Corp. v. Shevin, a case relied upon by MIED, the supreme court noted that collateral estoppel "is a judicial doctrine which in general terms prevents identical parties from relitigating issues that have previously been decided between them." 354 So.2d 372, 374 (Fla.1977). MIED had the opportunity to appeal the receivership order but chose not to do so. Thus, the propriety of the receivership had already been conclusively established and the trial court erred in allowing a jury to reconsider the issue.

*20 C. AHCA's Withholding of Medicaid Reimbursements
MIED's final breach of contract theory turned on AHCA's withholding of the April 1999 Medicaid reimbursements. MIED admits the terms of the provider agreement did not specify a payment due date. Also MIED does not dispute the fact that AHCA paid the entire amount due in two separate payments on May 27, 1999, and June 9, 1999. Nevertheless, MIED maintains that payment was due during the first two weeks of May 1999 and that AHCA's "delay" violated the contract provision requiring compliance with applicable laws and regulations.
Because the nursing home had been the subject of an investigation by the Medicaid Fraud Unit until May 10, 1999, the parties focus much attention on the requirement of AHCA to pay "clean claims," which would be those claims made by a provider not under investigation for fraud or abuse. See 42 C.F.R. § 447.45(b). Under federal Medicaid regulations, once a claim is deemed clean, AHCA must pay at least 90% of a practitioner's or group of practitioners' claims within thirty days. See id. § 447.45(d)(2). A "practitioner" is defined as "a physician or other individual licensed under State law to practice his or her profession." Id. § 455.2. Claims submitted by persons or entities not falling within the practitioner category are timely if paid within twelve months. Id. § 447.45(d)(4).
Our review of the regulations leads us to conclude that neither MIED nor the facility may be classified as a "practitioner" and, therefore, AHCA had twelve months in which to pay the April reimbursements. See United Cerebral Palsy Ass'n v. Cuomo, 966 F.2d 743, 745 (2d Cir.1992) (noting that Medicaid reimbursements for nursing facility services are to be paid within twelve months); Ill. Council on Long Term Care v. Bradley, 957 F.2d 305, 310 (7th Cir.1992) (finding that the only time limit imposed on state for Medicaid reimbursement to nursing facilities was the twelve-month limit of 42 C.F.R. § 447.45(d)(4)). Because AHCA paid the April reimbursement long before twelve months had elapsed, the reimbursement was timely irrespective of whether MIED's claim was "clean" on May 1 or May 10.
We find no competent, substantial evidence that AHCA violated applicable laws and regulations regarding payment of the reimbursements. Accordingly, the claim for breach of contract by withholding the April reimbursements must fail.

III. Equitable Estoppel Claim
Finally, we address the question of whether the trial court properly submitted MIED's equitable estoppel claim to the jury. In this state, equitable estoppel is a defensive doctrine rather than a cause of action. See Dep't of Transp. v. FirstMerit Bank, 711 So.2d 1217, 1218 (Fla. 2d DCA 1998). Florida has long recognized that "[e]quitable estoppel is not designed to aid a litigant in gaining something, but only in preventing a loss." Kerivan v. Fogal, 156 Fla. 92, 22 So.2d 584, 586 (1945). Such accords with the historical view of that doctrine. In Major League Baseball v. Morsani, 790 So.2d 1071, 1077 (Fla.2001), for example, the supreme court noted that "[b]y definition (and by usage throughout the centuries), equitable estoppel `estops' or bars a party from asserting something (e.g., a fact, a rule of law, or a defense) that he or she otherwise would be entitled to assert." MIED's estoppel count did not seek to bar AHCA from doing anything. Instead, it demanded "judgment for damages, costs, and such other and further relief as the Court may deem proper." In essence, MIED claimed that its abandonment of the rate step-up case notwithstanding, *21 AHCA should be compelled to reimburse it for monies allegedly lost due to AHCA's denial of the step-up.
Undeterred by the commonly accepted view, MIED attempts to frame equitable estoppel as a stand-alone cause of action entitling it to damages. On appeal, MIED relies upon two cases it believes have recognized estoppel as a cause of action. See Forest Creek Dev. Co. v. Liberty Sav. & Loan Ass'n, 531 So.2d 356 (Fla. 5th DCA 1988); Pasekoff v. Kaufman, 392 So.2d 971 (Fla. 3d DCA 1981). In our view, both of these cases are distinguishable.
First, Forest Creek actually referred to a claim of promissory estoppel rather than a claim of equitable estoppel. 531 So.2d at 357. Promissory estoppel requires proof of a promise the promissor would reasonably expect to induce action or forbearance on the part of the promisee. See W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So.2d 297, 302 (Fla. 1st DCA 1999) (identifying the elements of promissory estoppel). MIED's amended complaint, however, failed to allege that Hughes, an AHCA administrator, reasonably should have expected Carter to pursue the specific course of action that he did. Carter's own testimony revealed that Hughes told him a rate step-up would follow only if AHCA found that Carter retained no control of Southlake following his resignation. Hughes could not have foreseen that Carter would lay the groundwork for the sale, resign his position, and continue management of the facility through the date of the sale. Thus, the trial court should have dismissed the equitable estoppel count even if MIED had labeled it as a cause of action for promissory estoppel.
Second, in Pasekoff, the plaintiff's claim was actually a request for imposition of a constructive trust. 392 So.2d at 975-76. There, the appellate court held the trial court should have allowed the plaintiff to amend his complaint to raise a constructive trust claim "under the equitable estoppel theory applied in Chamberlain v. Chamberlain, 115 Fla. 21, 155 So. 136 (1934)." Id. at 976. Here, MIED attempted to frame equitable estoppel as a cause of action at law, in and of itself, rather than as a supporting theory for some other equitable remedy. Consequently, Pasekoff offers no support for MIED.
We also find that any cause of action based upon Hughes' alleged misstatements of law regarding unrelated purchaser is barred by sovereign immunity. Misstatements of law are insufficient to support a claim of estoppel against the state. See Branca v. City of Miramar, 634 So.2d 604, 606 (Fla.1994); Dep't of Rev. v. Anderson, 403 So.2d 397, 400 (Fla. 1981). Further, waiver of sovereign immunity in the context of a contract action can only be supported through an express, written contract. See, e.g., County of Brevard v. Miorelli Eng'g, Inc., 703 So.2d 1049, 1051 (Fla.1997) (finding that estoppel cannot be used to alter the terms of an express written contract because otherwise an "unscrupulous or careless government employee could alter or waive the terms of the written agreement, thereby leaving the sovereign with potentially unlimited liability").
The trial court should have dismissed MIED's equitable estoppel claim.

IV. Conclusion
MIED's three breach of contract theories and its equitable estoppel theory fail as a matter of law and should not have been presented to the jury. Our decision on these issues is dispositive and obviates the need to discuss the other issues raised on appeal by AHCA. We therefore REVERSE and REMAND with directions for *22 the trial court to enter judgment in favor of AHCA.
ERVIN and BOOTH, JJ., concur.